**C.    "In response to identifying a request for specified content data and a user identifier; (a)...(e)..."**

This portion of the claim language has a plain and ordinary meaning and does not require construction by the Court. It means what it says. Specifically, after a request for specified content data and a user identifier are identified, perform steps (a) through (e) of the claimed method. In practical terms, the claim is simply saying that once the web server knows that a particular user has requested a web page, the steps of generating the page should be performed. A jury can certainly understand that without further explanation by the Court.

Dow agrees with the obvious meaning of this claim language. Its proposed construction begins, "performing steps (a) through (e) in response to identifying a request for specified content data and a user identifier." This definition merely restates the claim language and reinforces the notion that it does not require construction. Dow's proposal then continues with, "wherein the request was transmitted by a browsing device." This is essentially true, but at this point Dow is no longer construing the claim language for which it is proposing a definition. Other claim language calls for "identifying requests from browsing devices." Rosenbloom Decl. Exh. A at Col. 20 l. 6.

Dow's departure from the claim language in question leads it to its most brazen attempt to simply add claim limitations that it feels will provide a non-infringement argument. Dow next proposes that the request "includes a format identifier that is separate and distinct from a user identifier." Dow makes no attempt to tie its proposed construction to any claim term. It simply adds a format identifier to the request and then adds that it is separate and distinct from a user identifier. The claim in question makes no reference to a "format identifier." The Court should reject this approach and address the term "format identifier," as Ablaise does, where it appears in a separate part of the claim.

**D.**    **"Receiving format identifiers identifying the type of formatting required"**

This phrase can be broken up into three parts.  First, "receiving" is a commonly understood word that does not require construction.  However, because of Dow's arguments Ablaise will explain that the language "receiving format identifiers" does not state any origin or means of delivery for the format identifiers – just that they are received.  Second, a "**format identifier**" in this claim is "**an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data**." Third, the plain meaning of "**type of formatting**" is simply "**a layout or presentation of text and/or graphics on a page**."  Other language in this claim limits the layout or presentation to "locations" on the page.

The practical effect of these constructions can be understood with reference to the disclosed preferred embodiment.  What really happens is that a user is presented with a web page and then makes a selection for where certain content should appear on the web page.  In many cases the server immediately returns the page in the user specified format.  The server may also remember the user and the type of formatting specified by the user by storing the format identifier.  Then, the next time that particular user asks for that web page, the server will identify the user, receive a format identifier corresponding to the type of formatting specified by that user from the storage location, and serve a web page with text and/or graphics located where the user wants.  The support for Ablaise's construction of "receiving," "format identifier," and "type of formatting" are provided below.

**1.**    **"*Receiving* format identifiers"**

As stated above, this term does not require construction.  Dow has not offered a construction for "receiving" and merely repeated the word "receiving" in its proposed construction. (Dow Br. 13.)  However, Dow asks the Court to find that "the format identifiers are

included in said identified request for specified content data." In other words, the format identifiers must be included with the URL calling for a web page and cannot be looked up in memory or a database. The claim language and specification prove this construction wrong, and the file history does not narrow the plain meaning of the claim language.

> **a.    The claim language is unambiguous, and not limited to receiving the format identifiers in the request.**

Initially, the word "receiving" means "receiving." It doesn't mean receiving from a particular location or in a particular way. The claim does not recite where the format identifiers were. It only requires that they be received. Claim construction is about defining terms in the claim. <u>SRI Int'l, Inc.</u>, 775 F.2d at 1121. Dow is simply not defining any term here. It is just adding words to the claim. To rule on this issue, the Court need look no further, but additional reasons will be provided.

In the context provided by the rest of claim 1 it seems more likely that the format identifiers do not come in the request. Claim construction requires interpretation of the entire claim in context, not a single element in isolation. <u>ACTV, Inc. v. Walt Disney Co.</u>, 346 F.3d 1082, 1090 (Fed. Cir. 2003). "Receiving format identifiers" is step (c) of five steps that happen "in response to identifying a request ....and a user identifier." Thus format identifiers are received "in response to" a request, not necessarily "in" the request. If the inventors had intended to limit the claim as Dow suggests, they would have claimed "in response to identifying a request including a format identifier," performing the following steps. That would be a different claim.

Finally, dependent claim 2 indicates that claim 1 is not limited to receiving a format identifier with the request. Dependent clam 2 introduces a new limitation to claim 1 that the format identifier needs to be received in the URL. The Federal Circuit has recognized through

the doctrine of claim differentiation that, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." <u>Kim v. ConAgra Foods, Inc.</u>, 465 F.3d 1312, 1319 (Fed. Cir. 2006) (quoting <u>Phillips</u>, 415 F.3d at 1315)). In this case, claim 2 adds the particular limitation that "said format identifier is received with said request for specified content data, whereby viewable data is served to a browser for display with a format that depends upon the particular format identifier received from said browser." Rosenbloom Decl. Exh. A at Col. 20, ll. 27-31. Thus, a presumption exists that the claim does not require that format identifiers are received with the request from the browser. The format identifiers can come from somewhere else.

<b>b.    The specification includes at least two embodiments to support the plain meaning of the claims.</b>

Dow commits two errors in seeking to import the limitation of "receiving format identifiers from a browser" from the specification into the claims. First, it is error to import a preferred embodiment into the claims contrary to the plain language of the claims. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 906 (Fed. Cir. 2004). The preferred embodiment in the specification clearly discloses receiving format identifiers with a request from a browser as recited in claim 2. <u>See, e.g.</u>, Rosenbloom Decl. Exh. A at Col. 14, ll. 3-7. However, there is no word in claim 1 that can be defined to include this limitation.

Secondly, Dow commits error by seeking a construction that contradicts the specification. The specification discloses another embodiment in which the format identifier is received from a storage location and not from the browser. Specifically, the specification teaches that the server

and associated software may look up information in a "user database" and use that information to change which HTML formatting tags it writes into a dynamically generated page. Rosenbloom Decl. Exh. A at Col. 15, ll. 6 - Col. 16 ll. 14. In this embodiment, the format identifier is received from the user database, rather than from the URL sent by the browser.

This embodiment is found in a part of the specification that describes how data is processed in the preferred embodiment to generate pages on-the-fly that include formatting data ("HTML data" known as tags), text data, and graphics data. See e.g. Rosenbloom Decl. Exh. A at Col. 15, ll. 6-34. In this embodiment, the computer uses one or more "functions" to write HTML format tags. The functions may be put together as a string of functions that have a particular index that identifies that string of functions. The computer uses "indexes" to find the functions it needs, for example to write a particular format tag. This embodiment describes using information in the user database to change which index the computer uses to find one or more formatting functions. This part of the description concludes, "Thus, it is possible to adjust the relationship between indexes and strings, *thereby adjusting the way in which the data is actually formatted in response to a particular request*." Id. at Col. 15, ll. 31-34. How this adjustment occurs is further described:

> [i]n addition to use [sic] the user database to confirm user validity and to record actions made by the user (possibly for billing purposes) the on-line processor 301 may also make <u>use of information read from the user database</u> in order to adjust the relationship between indexes (1106, 1109, 1110) and their <u>associated function strings</u> and data (1107, 1108, 1111).

Rosenbloom Decl. Exh. A at Col. 16, ll. 8-14 (emphasis added). Parsing the quote, the information read from the user database may be used to adjust the relationship between index 1106 and associated function strings 1107. See Fig. 11. Moreover, "[e]xecution of a function read from the string list may result in HTML tags being written directly to the output HTML

buffer." Id. at Col. 15 ll. 54-56. If a different function is called, a different HTML tag may be written. Thus, information read from the user database may include a user format preference which corresponds to certain HTML tags being written, "thereby adjusting the way in which the data is actually formatted in response to a request." In other words, format identifiers may be stored and later read from the user database. This explains why the inventors claimed broadly "receiving format identifiers." They could be received from more than one place, for instance, from a database or with a request. The claim should not be limited to exclude this alternative embodiment in which the format identifier need not be received with the request from the browser, and instead can be received from a storage.

### c.    The file history does not alter the plain meaning of the claims.

The statements in the file history cited by Dow do not show a clear disavowal of claim scope. The Federal Circuit explained in Teleflex that,

> "claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."

Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002) (emphasis added). In addition, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of those negotiations, it often lacks the clarity of the specification and thus is far less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

Dow points to statements made to distinguish U.S. Pat. No. 5,848,413 issued to Wolff ("Wolff") (Foster Decl. Ex. B). Wolff is directed to a system and method for accessing and publishing electronic documents. When the Examiner asserted that Wolff met the limitation of

"receiving format identifiers," the Examiner pointed to several passages within Wolff that all included a discussion of a URL that acted as a locator/identifier of documents. (See Foster Aff. Ex. C, Office Action, dated 9/17/2003, at 4 (citing, by the examiner, Wolff at Col. 5, ll. 47-67, Col. 6, ll. 30-57 and Col. 7, ll. 6-61, Col. 9, ll. 28-67.) Therefore, the examiner took the position that Wolff taught receiving format identifiers by receiving locators/identifiers in a URL request, i.e., a request from a client to a server.

In response, the inventors argued that the examiner misunderstood the meaning of "format" in the claims. The word "format" in the Wolff patent referred to data transmission protocol, not graphical format – the layout of content on a page. Thus, in Wolff, the same document was sent in different ways, such as by fax or by HTTP, rather than two different documents being sent with different "format" for the same content on the page. As argued by the inventors, in the Wolff patent "the requested documents is [sic] sent in different file signal transmission formats (using http protocol or G3 protocol), there is no suggestion that the layout of the page content being transmitted is different in either case." Rosenbloom Decl. Ex. M, Amendment, dated Dec. 16, 2003, at 15. The inventors were trying to make this distinction about "format" with the following statements relied on by Dow:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.
>
> *     *     *     *
>
> As will be explained in more detail below, it is not believed that the cited Wolff reference in any way teaches serving the same text/graphic content in different viewable page formats- depending upon received requests incorporating respectively different format identifiers.

Id. at 13. A close examination of these statements reveals no disavowal of claim scope.

First, these statements are not addressing the question of where the format identifiers are received from, or even the claim language "receiving format identifiers" that the Court is being asked to interpret. The issue at hand was whether two different data transmission protocols are the same as two different "formats" or page layouts. Hypothetically speaking, this is not a situation where the Examiner cited prior art in which format identifiers were received from a database, and the inventors stated that their format identifiers come with the request.

Second, because the Wolff patent dealt only with transmission of requested documents, and not looking up anything in a database, it makes sense the inventors would make, an apples to apples comparison with the embodiment of their invention where the format identifiers do come with the request.

Third, the first statement cited by Dow is expressly open ended. It states that "a particular format identifier received from each respective client at the server," but does not expressly state that format identifier was included with the request for content data. Even though the second statement places the format identifier in the request for content data, the statements read together cannot be considered a clear disavowal of claim scope.

Fourth, at the time the inventors made these remarks, dependent claim 3 recited that "said format identifiers are received from browsing devices with said requests for specified content data." Id. at 3. Dependent claim 16 was nearly identical. Id. at 9. These claims, just like issued claim 2, demonstrate that the independent claims were not limited to receiving the format identifiers with the request. It could not have been the inventor's intention, or the Examiner's understanding, that independent claims 2 and 15 were limited to the scope of dependent claims 3 and 16. Had the Examiner interpreted the statements as Dow urges, he would have required the limitation of claim 3 to be added to claim 2 to limit it to receiving format identifiers with the

request. He did not because that did not reflect the context or the meaning of the statements. Read in this context, it is clear that no disavowal of claim scope occurred.

Finally, statements Dow raises from the '530 file history are inapposite. The claims of the '530 patent are limited to receiving formatting information in the request. Claim 1 of the '530 patent states, "identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data." Rosenbloom Decl. Exh. A at Col. 19. ll. 61-62. (emphasis added). It is wholly unremarkable that in discussing those claims the inventors would state that "the present invention receives data from a browser which indicates the type of formatting required by the browser." Rosenbloom Decl Ex.O, Amendment dated April 13, 2000, at 6. In fact, the express limitation in the claims of the '530 patent to receiving formatting type identification data in the request, and the absence of such a limitation in the '737 patent, demonstrates that the inventors knew how to claim it both ways. They intentionally choose not to limit the '737 patent to receiving format identifiers in the request for content data.

### 2.    "format identifiers"

A "format identifier" in this claim is "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data."

The claim language is nearly self defining. It expressly recites that a format identifier must identify the type of formatting required. '737 Patent, Claim 1. The parties seem to agree on this point.[5] However, Ablaise's definition correctly points out that in order to identify a particular type of formatting, there must be at least two available types of formatting. Obviously,

---

[5]    For instance, Dow states that the "specification teaches that the term 'format identifier' simply means 'an identifier for the [type of] formatting requested [i.e., required]." In this case, the requester is the user who requires a certain type of formatting.

a key purpose for the invention claimed in the '737 is to allow a user to choose between at least two available types of formatting, and there is no need for an identifier if there is only one option.

The well known term "identifier" does not require further construction. The patent specification at one point uses the alternate term "element" stating, "an element identifying the type of formatting required." Rosenbloom Decl. Exh. A at Col. 14, ll. 4-5. The dictionary definitions cited by Dow include a "name," "token" and a "string of characters." Dow leaves out a further definition from one of its sources which is "a sequence of bits *or* characters that identifies a program, device or system to another program, device or system." IBM Dictionary of Computing p. 323 (1994). There is no reason to single out "a sequence of one or more characters" as Dow has. An "identifier" to one of ordinary skill in the art can include all of these examples depending on how they are used. (Hicks Aff. ¶ 24.) Specifically, "the defining characteristic of an identifier is that it identifies something." (Id.) Finally, Ablaise's definition indicates that a format identifier corresponds to a type of formatting specified by a user for specified content data. The claim itself indicates that the step of "receiving format identifiers identifying the type of formatting required is done "in response to identifying … a user identifier." Rosenbloom Decl. Exh. A at Col. 20, ll. 12-13. Moreover, the specification describes that users indicate preferences such as which type of formatting they prefer. For instance, one claimed mode of operation made it "possible for the user to identify information to the system as a means of expressing user preferences. . . . Thus, it is possible for the user to specify preferences such that the system becomes more tailor-made and specific to that particular user." Id. at Col. 16 ll. 39-41, 61-63 (emphasis added). These excerpts illustrate that the term "format identifier" in the '737 patent identifies specified user preferences.

The file history further confirms the role of the format identifier as follows:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.

Amendment filed Dec. 16, 2003 at 13. This statement indicates the intention for the claims to cover a method where the format identifier comes from the client and indicates the format requested by the client for particular content.[6] Thus, a format identifier is "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data."

### 3.    "type of formatting"

The plain meaning of a "**type of formatting**" is "**a layout or presentation of text and/or graphics on a page.**" It is undisputed that formatting in the '737 patent means page layout. As described above, the claims, specification and file history demonstrate that a user chooses a type of formatting and that choice is supplied to the server in the form of a format identifier. The format identifier is then used by the server to return a page displaying the chosen type of formatting, or it is stored for use the next time that user requests content. Moreover, just as a user identifier identifies a user, a format identifier identifies a user's chosen type of formatting. In other words, a "type of formatting" in the '737 patent is simply how a user wants the page to look. (Hicks Aff. ¶ 25.) As will be seen in the next section, the server then selects functions based upon what content that user wants, and how the user wants the page to look.

Dow urges a radically different definition of "type of formatting." Dow's definition, "indexed function string," represents a fundamental misunderstanding of the claim. Dow's

---

[6] (See Part III.D.1.A supra. for the proposition that the format identifier need not be included with the particular request for content).

mistake may stem from the fact that a format identifier can identify more than one thing. The claim requires that it identify the type of formatting required by the user. It can also identify to the server what the server must do to generate that type of formatting. In the claim, the program running on the server selects one or more functions in dependence upon a format identifier. This does not mean that the "type of formatting" is the "set of functions" selected. <u>SRI Int'l, Inc. v. Matsushita Elec. Corp.</u>, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

Dow is correct that in the preferred embodiment, a format identifier is also used to select indexed function strings. That does not change the fact that a format identifier also identifies the "formatting requested" by the client. Rosenbloom Decl. Exh. A at Col. 14, ll. 37-38. Clearly, a user does not request an indexed function string. A user requests a type of formatting, that is, "a layout or presentation of text and/or graphics on a page."

**E.    "Selecting a set of stored functions in dependence upon a received format identifier and said read user information."**

The phrase "selecting a set of stored functions in dependence upon a received format identifier and said read user information" has a plain and ordinary meaning of "selecting one or more functions based upon a received format identifier and said read user information." As already described above, a "function" is an "identifiable unit of computer instructions." A "set" has a plain and ordinary meaning to one skilled in the art. It simply means one or more of an entity, in this case, the stored functions.[7] The remaining word in this claim limitation, "selecting" has a plain and ordinary meaning to one skilled in the art. It means "selecting" and therefore does not need to be construed. (Hicks Aff. ¶ 26.) It is important to understand that this Court need not construe each and every element of every asserted claim, nor must it construe a

---

[7] <u>See, e.g.</u>, <u>IBM Dictionary of Computing</u>, 1994 (a set is a "finite or infinite number of objects of any kind, of entities, or of concepts that have a given property or properties in common"); <u>Microsoft Computing Dictionary</u>, 1994 (a set is a "group of objects, usually having one or more characteristics (properties) in common")

disputed claim element merely because a party raises it during the *Markman* proceedings. In this case, there is no better or more explanatory term than the one in the claim: selecting. Any attempt to change the word is likely to be either redundant or a change in the meaning of the claim without justification. See N. Telecom Ltd. v. Samsung Elects. Co., 215 F.3d 1281, 1288 (Fed. Cir. 2000) ("The use of extrinsic evidence to construe the scope of a claim is improper where the ordinary and accustomed meaning of a claim term does not render the scope of the claim unclear and where the patentee has not chosen to be his own lexicographer.")

The specification provides support for the plain and ordinary meaning of selecting. For instance, one example in the specification is that the term "selecting," when used in reference to functions, can mean "calling" those functions. The relevant portion of the specification states, "when a particular call is made for formatting signals, in the form of an executable string of functions, the particular call identifies the index reference within the list of strings, resulting in the selected index being selected from the list and thereafter executed in combination with the referenced data." Rosenbloom Decl. Exh. A at Col. 13 ll. 53-56. It is clear from this portion of the specification that "a particular call" results in a function being "selected . . . and thereafter executed in combination with the referenced data." Id. (emphasis added). In this portion of the embodiment, the call is the selection. This explanation is consistent with the common practice of computer programming. When a software program needs to "execute" a function, the computer program must first invoke that function—often with "data" such as a variable—so that the system can transfer control of the program to that function or subroutine. This process is referred to as calling a function and is the process of how a computer program programmatically selects a particular function. (Hicks Aff. ¶ 27.) The selection of one or more functions are based upon a received format identifier and said read user information, meaning, that at least one

function in the set must be selected based in whole or in part on the read user information and at least one function within the set must be selected based in whole or in part on a format identifier.[8]

Dow asks the Court to rewrite the claim language in question to read, "choosing a particular stored and indexed function string from a set of stored and indexed function strings, wherein the selection is dependent on both a received format identifier and said read user information, which are separate and distinct, and the format identifier is included in said identified request for specified content." Dow's construction ignores the specification when explaining specific claim terms, but inserts details of the preferred embodiment into the claim that are inconsistent with the claim language itself. Dow argues incorrectly to: (1) define selecting as "choosing"; (2) limit "a set of stored functions" to an "indexed function string from a set of stored and indexed function strings"; and (3) require that the "format identifier is included in said identified request for specified content."

### 1.    "Choosing" is not the plain and ordinary meaning of "Selecting" in the context of selecting computer functions.

Dow relies on a modern general purpose dictionary, the 2004 American Heritage Dictionary, to define the term "selecting." Dow provides no justification why this definition helps this Court better understand selecting within the context of the art. Extrinsic evidence should only be relied on when the specification lacks guidance, and should not be used to contradict the specification. <u>Phillips</u>, 415 F.3d at 1321. Here, the meaning is clear to one of ordinary skill in the art, and the specification provides further guidance. For example, the specification explains that one way to select a function is by "calling a function." The relevant

---

[8] Although Ablaise does not contest that "read user information" is distinct from "format identifiers" it does contest Dow's mischaracterization of statements made by Ablaise's counsel during the course of unrelated licensing discussions where it arbitrary inserts "[i.e., user preference information]" to characterize components of the prior art as incorporating user preference information.

question is what someone of ordinary skill in the relevant art would have understood the term to mean *at the time of the invention.* Phillips, 414 F.3d at 1313. It is not what a general purpose dictionary says 9 years later. Dow's construction is therefore both unnecessary and incorrect.

> **2.    A "set of functions" is not limited to an "indexed function string from a set of stored and indexed function strings."**

Dow takes a simple term to those with ordinary skill in the art, "set" and attempts to limit it to a particular kind of set disclosed in the preferred embodiment, "an indexed function string."[9] Dow further attempts to *limit its limitation* by arguing a "function string" must be from a "set of indexed function strings." Dow attempts this limitation even though the claims never recite the term "function string." The claim recites "selecting a set of functions" not "selecting a set of function strings."

Moreover, the specification describes functions, as independent entities, as distinct from "function strings" which are identified only in the preferred embodiment. As Dow aptly points out, the specification also explicitly references a "set of functions." Rosenbloom Decl. Exh. A at Col. 16 l. 4. Dow's assertion that a set of functions can only be a function string and that those function strings must be stored in a set of function strings is therefore incorrect.

The specification, and Dow's own previous arguments, acknowledge that a "set of functions" is not limited to just "indexed function strings" but can instead take multiple forms. First, Dow acknowledges that a "set" in the context of functions could simply be one or more of a related entity. In defining "storing executable functions," Dow states that each function "consists of a set of function steps," (Dow Br. 19) (emphasis added), a phrase they later articulate as requiring that each function "consists of <u>one or more function steps</u> (<u>i.e.</u>,

---

[9] Notably, Dow earlier argues that a "type of formatting" is "an indexed function string." Here, Dow argues that a "set of functions" is "an indexed function string." Dow's arguments have no basis in fact or law. Dow simply wishes to add "indexed function string" to the claims in order to manufacture another limitation to the claimed invention.

instructions)." Id. (emphasis added).  Second, an embodiment within the specification also describes a string of functions, or "function strings" which also may be considered a "set of functions" since they include one or more functions.  See, e.g., Rosenbloom Decl. Exh. A at Col. 13 ll. 9-15.  Third, the portion of the preferred embodiment Dow relies upon actually discusses executing an "identified set of functions" read from "particular function strings." Id. at Col. 15 ll. 63-67 –Col. 16. ll. 1-7; see also (Dow Br. 38).  Therefore, a "set of functions" could also consist of one or more functions read from multiple "function strings."  Finally, the preferred embodiment identifies a "universal family set of all the available functions."  Rosenbloom Decl. Exh. A at Col. 12 ll. 49-51.  Here, the specification uses "set" generically to refer to all of the computer program's functions.  In most of these examples, the "set of functions" are independent and unrelated to "function strings."  It is clear, therefore, that the plain and ordinary meaning of a "set of functions" merely refers to "one or more functions" which by consequence can take different forms.  There is no basis for Dow's attempt to limit a "set of functions" to only one such form discussed in the preferred embodiment.  Dow's tortured construction is both unnecessary and unsupported.  There is no reason to alter the plain and ordinary meaning of a set of functions, which is "one or more functions."

> **3.    The claim language does not state that the "format identifier is included in said identified request for specified content data."**

For the third time, Dow adds the limitation that the format identifier must be included in the request.  This claim language is talking about selecting functions.  It has nothing to do with the origin of the format identifier.

> **F.    "Executing said set of functions to generate viewable data comprising said selected content data and formatting data"**

The only term in this phrase that may require construction is **"formatting data."**  The plain and ordinary meaning is, **"markup language, such as HTML tags."**  The rest of the

phrase is simply the logical final step of serving a page. The functions are executed to generate viewable data comprising content data and formatting data.

Dow chooses this portion of the claim to argue that "formatting data" is limited to "locations" for text and graphics. It is undisputed that "formatting data" in the specification is mark-up language such as HTML tags that a browser can interpret to alter the layout or presentation of text or graphics. Moreover, HTML tags can control location, font, color, bold etc. However, for this claim, the inventors chose to limit the claim to particular formatting data "which specifies locations of said text and/or graphics with a page." Rosenbloom Decl. Exh. A at Col. 20, ll. 1-2. This limitation came in an amendment to the preamble. Rosenbloom Decl. Ex. M, Amendment, dated Dec. 16, 2003, at 1-12, 16. Thus while Dow's definition is not in accordance with the plain and ordinary meaning of "formatting data" as used in step (e), it is correct to say the claim in general is limited to certain formatting data which specifies location. No further construction of this phrase is required.

## IV.    CONSTRUCTION OF CLAIM TERMS IN CLAIM 1 OF THE '530 PATENT

In claim 1 of the '530 patent, a browsing device has requested a web page with a specified page format. In practical terms, the method of serving the web page back to the browsing device encompasses (1) identifying the specified page format from information provided in the request, (2) selecting formatting data (HTML tags) needed to create the specified page format; and (3) generating a customized web page from at least two options for the format of a portion of the page. Ablaise's proposed constructions provide a logical and correct reading of the claim to accomplish these objectives.

A.    **"Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data"**

While Dow identifies this entire phrase, only "formatting type identification data" requires construction. It means, "data corresponding to a specified page format chosen from at least two page formats available to the requesting browsing device for specified viewable data." The rest of the words in the phrase have a plain meaning and do not require further definition.

"Formatting type identification data" is clearly similar to "a format identifier identifying a type of formatting" in the '737 patent. In the '737 patent claim 1 a user chooses a type of formatting. The format identifier then identifies the type of formatting chosen, and is used by the server to select a set of functions to execute. In the '530 patent, there is "a specified page format." Rosenbloom Decl. Exh. B at Col. 19, l. 59. Formatting type identification data is then sent from the browser to the server corresponding to the specified page format. Id. at Col. 19, ll. 61-63. The server then selects formatting data, instead of functions, in response to the formatting type identification data. Id. at Col. 20, ll. 4-5. Finally, viewable data, a web page, is sent back to the browsing device in the specified page format. Id. at Col. 20 ll. 14-19. Thus, the claim language supports Ablaise's definition that the formatting type identification data corresponds to a specified page format.

The claim itself also makes clear that there at least two page formats to chose from. The "output signals" enable a browser to generate a "first page format" or a "second page format" depending upon which formatting data is selected. Id. at Col. 20, ll. 14-19.

Finally, "formatting type identification *data*" is a broader term than "format identifier." It can, for instance, include a user identifier if the user identifier is used to select between two or more page formats. Unlike the '737 patent, there is no claimed "user identifier" in the '530 patent. Thus, there can be no argument that the two are separate and distinct based on the claim

language. If the server recognizes the "data" as corresponding to specified page format selected from two page formats available to the browsing device, then the data is "formatting type identification data."

The inventors also clearly stated in the file history that "formatting type identification data" is a broader term. They stated, "the present invention receives data from a browser which indicates the type of formatting required by the browser (i.e., it includes formatting type indication data, which is exemplified in the description as a format identifier." Rosenbloom Decl. Ex. O, Amendment filed April 13, 2000 (emphasis added). This statement makes clear that while a format identifier "exemplifies" formatting type identification data, it is not the only example of formatting type identification data. Another example could be a user identifier. In fact, when discussing the selection of formatting data the inventors previously stated, "[s]uch selection may be on the basis of user information provided from the browser (with or without the assistance of a user database in the server) but the invention is not so limited." Rosenbloom Decl. Ex. R, Amendment dated August 20, 1999, at 5. Thus, the Examiner clearly understood the selection of formatting data could be made in dependence upon user information.

Dow admits a difference between "format identifier" and "formatting identification type data" by proffering two constructions. However, Dow's broader definition of "formatting type identification data" is still incorrect. Dow insists that the "data" must identify "a certain file structure." The claim itself demonstrates that the "data" identifies a "specified page format" and is used to select a "type of formatting data" – such as an HTML tag. Dow's confusion stems from a mistaken view of what "type of formatting data" means. Ablaise, will construe this term below, in connection with where it actually appears in the claim.

**B.    "Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data"**

This phrase does not require construction except for the term "formatting types of data." The plain meaning of "formatting types of data" in the context of the '530 patent is "sets of mark-up tags, such as HTML tags."   Furthermore, Dow improperly adds a limitation that formatting types of data must be stored in table.

**1.    "Formatting types of data"**

The meaning of "formatting types of data" is clear from the context of the claim.  A person of ordinary skill in the art would immediately understand that content data is combined with formatting data (i.e. HTML tags) to generate viewable data as claimed.  Claim 1 adds that formatting type identification data is used to select one type of formatting data or another for a portion of the viewable data.  Rosenbloom Decl. Exh. B at Col. 19, l. 64- Col. 20, l. 6.  The word "type" is simply used to designate one set of tags (a set could be one tag) from another such that, depending on the selection of formatting data, a specified page format may be returned to the browser.

The specification further supports the plain meaning of types of formatting data, stating:

> An (HTML) file is essentially an ASCII document interspersed with tags for formatting text and displaying images.  The tags graphically represent instructions which are acted upon by a receivers browser, configured to render text or graphics.  The browser has full control of how the page is displayed, therefore it is possible to generate a wide range of page lay-outs from a modest set of (HTML) tags.

Id. at Col. 3, ll. 1-8.  The specification further explains the basic process of serving a web page stating, "viewable information is then processed so as to combine it with HTML tags, to produce output signals for transmission to browsing clients."   Id. at Col. 11, ll. 31-33.  Thus the

specification is clear that formatting data means HTML tags and a type of formatting data is simply one set of tags instead of another.

Dow argues that "type of formatting data" means "file structure." Dow's definition will not help the Court or a jury because it begs the question, "what is a file structure?" The specification uses the term "file structure" in two contexts. First, the specification notes that "HTML files may be stored in file structures that are substantially similar to conventional data formats." Id. at Col. 3, ll. 38-39. In this context, file structure means a common directory structure for storing information – in this case an HTML file with content data and formatting data already combined. This is not part of the invention.

Another part of the specification, cited by Dow, describes the basic operation of a server. The processor on the server receives human viewable data from a database and file structures from a file structure source. Id. at Col. 8 ll. 29-32. Then the processor combines the human viewable data with file structure data to generate a web page. Id. at Col. 8, ll. 32-36 (emphasis added). In this context, a "file structure" is a broad term which includes an HTML template which can be selected for formatting a portion of a web page. File structure data appears to operate in the same fashion as formatting data – it defines the presentation or layout of human viewable data (text and/or graphics) on a page.

Thus, Dow's construction is imprecise and confusing. Claim 1 does not recite a "type of file structure data" as stated in the specification language cited by Dow. The claim recites "type of formatting data." There can be no dispute that formatting data is "mark-up language such as HTML tags." The claim simply indicates a selection between one type of formatting data or another.

### 2. "Maintaining" does not require "maintaining in a table."

The claim recites "maintaining a plurality of formatting types of data…" The word maintaining does not require construction. It includes, but is not limited to storing. For instance, it could also include maintaining in the code. (Hicks Aff. ¶ 31.)

Dow's proposed construction, "storing, in a table, . . ." effectively admits that "maintaining" includes "storing." For some result oriented purpose, Dow adds, "in a table" without defining any claim term. Consequently, Dow's proposal is nothing more than an invitation to rewrite the claim to say, "maintaining, **in a table**, a plurality of formatting types of data…" That would be a different claim.

Dow attempts to support its importation of a limitation into the claim by citing to the preferred embodiment. Dow argues, "the only specific structure identified for maintaining formatting type data is the 'string list store 1103', which is a table within a relational database.' (Dow Br. 44.) Initially, this is a method claim comprising steps that must be performed, not an apparatus claim with a "specific structure." There is no basis to search in the specification for a "specific structure" with which to limit the claim. In addition, the word "table" is not used in the specification cited by Dow.

Furthermore, the "string list store 1103" in the preferred embodiment clearly stores functions, not "formatting types of data." See e.g., Rosenbloom Decl. Exh. B at Col. 15, ll. 54-64 ("formatting information for the URL will result in particular function strings being read from the string list store"). Functions may be used, for instance, to call for content from a database, read the content, call for certain formatting data, or to write formatting data and content data to be served as a web page. See Id. at Col. 18 ll. 3-55. The claim language in question only requires "maintaining a plurality of formatting types of data." Dow is not only trying to import

the preferred embodiment into the claims, it is pointing to an largely irrelevant portion of the preferred embodiment.

Finally, Dow's reference to the file history is misguided, and far short of a disavowal of claim scope. The inventors were arguing that a prior art patent to Meske did not allow the selection between two different types of formatting for text or graphics. Amendment dated August 29, 1999, p. 5. Passing reference to the string list store which stores functions in the preferred embodiment as "table 1103" is irrelevant. There is no indication that the inventors limited the plain meaning of the claim language "maintaining" to "storing, in a table." Maintaining means maintaining.

### C.      "Selecting a specific one of said types of formatting data in response to said formatting type identification data"

This phrase does not require construction. The phrase "types of formatting data" is the same as "formatting types of data" construed above and means "sets of mark-up tags, such as HTML tags." Dow only proposes that "selecting" means "choosing." This construction adds nothing and is unnecessary.

### CONCLUSION

For the foregoing reasons Ablaise respectfully requests that the Court reject Dow's attempt to limit the claims to the minutia of the preferred embodiment and to enter an Order in accordance with the constructions proposed by Ablaise.

DATED:  April 4, 2007

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

_____
Jeffrey J. Downey (#427010)
T. Monique Jones
1875 Eye Street, NW, Suite 300
Washington, D.C. 20006-5409
Tel:  (202) 775-0725
Fax:  (202) 223-8604

Ron J. Schutz
Jake M. Holdreith
Cyrus A. Morton
Trevor J. Foster
Seth A. Northrop
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel:  (612) 349-8500
Fax:  (612) 339-4181

Thomas G. Scavone
Niro, Scavone, Haller & Niro, Ltd.
181 West Madison Street, Suite 4600
Chicago, IL 60602-4515
Tel:  (312) 236-0733

**ATTORNEYS FOR PLAINTIFF
ABLAISE LTD. AND GENERAL INVENTIONS
INSTITUTE A, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Ablaise LTD and General Inventions Institute A, Inc.'s Responsive Markman Brief in Support of its Proposed Claim Construction, Affidavit of Andrew M. Ritchie, Affidavit of Christian B. Hicks and Declaration of Trevor J. Foster were served this 4th day of April, 2007 via electronic means and first class mail, postage prepaid, to the following:

Creighton R. Magid
Dorsey & Witney LLP
1001 Pennsylvania Avenue, N.W.
Suite 400 North
Washington, D.C. 20004
Ph: (202) 442-3000
Fx: (202) 442-3199


Devan V. Padmanabhan
Sri K. Sankaran
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Ph: (612) 340-2600
Fx: (612) 340-8856

Attorneys for Plaintiff


Jeffrey J. Downey