# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DOW JONES & COMPANY, INC. | ) | |
| 200 Liberty Street | ) | |
| New York, New York 10281 | ) | |
| | ) | **Civil Action No. 1:06CV01014** |
| Plaintiff, | ) | |
| | ) | **Judge James Robertson** |
| v. | ) | |
| | ) | |
| ABLAISE LTD. ("Ablaise") | ) | |
| 40 Queen Anne Street | ) | |
| London W1G 9EL | ) | |
| United Kingdom | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GENERAL INVENTIONS | ) | |
| INSTITUTE A, INC., ("GIIA") | ) | |
| Craigmuir Chambers | ) | |
| P.O. Box 71 | ) | |
| Town Road | ) | |
| Tortola, British Virgin Islands | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| DOW JONES REUTERS | ) | |
| BUSINESS INTERACTIVE, LLC | ) | |
| 200 Liberty Street | ) | |
| New York, New York 10281 | ) | |
| | ) | **Civil Action No. 1:06CV01015** |
| Plaintiff, | ) | |
| | ) | **Judge James Robertson** |
| v. | ) | |
| | ) | |
| ABLAISE and GIIA | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### ABLAISE LTD. AND GENERAL INVENTIONS INSTITUTE A, INC.'S MARKMAN SUR-REPLY BRIEF IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

I.    THE ABLAISE PATENTS DISCLOSE AND CLAIM CUSTOM FORMATTED
      WEB PAGES. ...........................................................................................................2

   A.    The Inventors Claimed the "Specified Format" Aspect of Their Invention. .......................2

   B.    The Specification Enables A System And Method That Generates HTML
         Dynamically Based On A Specified Format. ....................................................................3

   C.    The Entire File History Is Dedicated To Claiming a System and Method That
         Generates Html Dynamically Based On a Specified Format. ............................................4

II.   TWO KEY POINTS OF LAW IGNORED BY DOW. ...........................................................5

   A.    Claims Are Not Limited By Unclaimed Details In The Specification, Even Where
         The Specification Discloses Only One Embodiment. ........................................................5

   B.    Dow Never Identifies "Words Of Manifest Exclusion" "Intentional Disclaimer"
         Or "Disavowal Of Claim Scope" In The Specification. ....................................................6

III.  PROPER CONSTRUCTION OF DISPUTED CLAIM LANGUAGE IN THE '737
      PATENT. .................................................................................................................6

   A.    Storing Executable Functions. ....................................................................................6

      1.   The claims do not recite "storing a universal family set of all available
           functions." .....................................................................................................8

      2.   Functions can be identified by more than just a name. ....................................9

      3.   Not all functions create a portion of code. ......................................................9

   B.    In Response To Identifying A Request For Specified Content Data And A User
         Identifier; (A)...(E). .................................................................................................9

      1.   Dow ignores the claims when construing "request." ......................................10

      2.   Comparing the term "request" with other claim language demonstrates a
           "request" need not include a format identifier. .............................................11

      3.   The specification does not limit the claims to a format identifier included with a
           request. ........................................................................................................12

4.  The prosecution history does not limit the claims to a format identifier included with a request. .................................................................................................. 13

5.  Dow's new attempt to read out "a request to retrieve and execute a specified file" should be rejected. ....................................................................................... 15

C.  Receiving Format Identifiers Identifying The Type of Formatting Required. ................. 16

1.  Receiving. ...................................................................................................... 16

2.  Format identifiers. ......................................................................................... 17

3.  Type of formatting required. ........................................................................ 18

D.  Selecting a Set of Stored Functions In Dependence Upon a Received Format Identifier and Said Read User Information. ...................................................... 19

1.  Dow's position that a "set of stored functions" must be an "indexed function string" is without merit. ................................................................................. 20

2.  Dow's position that each function must be selected in dependence upon a received format identifier and read user information is without merit. .......................... 21

IV.  PROPER CONSTRUCTION OF DISPUTED CLAIM LANGUAGE IN THE '530 PATENT. ................................................................................................................... 22

A.  Requests from browsing devices that define a request for specified viewable data. ......... 22

B.  Formatting type identification data. ................................................................. 23

C.  Formatting types of data. .................................................................................. 24

D.  Maintaining a plurality of formatting types of data. ........................................ 24

E.  Selecting a specific one of said types of formatting data in response to said formatting type identification data. ................................................................... 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

Gemstar-TV Guide Int'l, Inc. v. ITC,
383 F.3d 1352 (Fed. Cir. 2004) ..........................................................................6, 12

Gillette Co. v. Energizer Holdings, Inc.,
405 F.3d 1367 (Fed. Cir. 2005) ...................................................................6, 8, 12, 21

Honeywell Int'l, Inc. v. ITT Indus., Inc.,
453 F.3d 1312 (Fed. Cir. 2006) ..............................................................................16

Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,
381 F.3d 1111 (Fed. Cir. 2004) .........................................................................13, 14

MBO Labs., Inc. v. Becton, Dickonson,& Co.,
474 F.3d 1323 (Fed. Cir. 2007) ...............................................................................21

Phillips v. AWH Corp.,
415 F.3d 1313 (Fed. Cir. 2005) ...........................................1, 5, 6, 7, 11, 13, 19, 20, 22

SRI Int'l v. Matsushita Elec. Corp.,
775 F.2d 1107 (Fed. Cir. 1985) ...........................................................................1, 10

## INTRODUCTION

Inventors Andrew Ritchie and Jonathan Bradshaw disclosed a way for a web server to let Internet users specify the layout of pages they requested. They also disclosed a way for users to specify content in a request for a page. Dow frequently focuses on the content, but ignores the format. However, claims filed in the original application, and all of the claims in the '530 and '737 patents, relate to specified page *formats*. The claims should be construed accordingly.

Neither Dow nor its expert make any attempt to ascertain or address the plain and ordinary meaning of words commonly used to describe computers and web page delivery over the Internet such as "request" and "function." The meaning of these words is readily apparent to one of skill in the art. Phillips v. AWH Corp., 415 F.3d 1313, 1314 (Fed. Cir. 2005) (en banc). In addition, almost all of Dow's constructions violate Phillips by simply adding words (such as "indexed function string") to the claims instead of defining terms in the claims. Id. at 1323; SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc) ("Specifications teach. Claims claim."). Dow frequently repeats the claim language in its "definition," and then adds other limitations from the specification. Dow is ignoring the plain meaning of the words in the claim, instead of defining them.

In this sur-reply, Ablaise will continue to support its definitions of the words and phrases appearing in the claim language using the claims themselves, claim differentiation, the specification and the file history in the manner described in Phillips. This remains in stark contrast to Dow's approach of seeking to rewrite the claims to include details disclosed in the preferred embodiments.

MP3 20227527.2                                   1

I.  **THE ABLAISE PATENTS DISCLOSE AND CLAIM CUSTOM FORMATTED WEB PAGES.**

Ablaise has clearly and consistently disclosed and claimed page formatting. The Summary of the Invention includes a "specified page format." '737 pat., Col. 5, ll. 7-12. Original claims filed in 1995 were directed to specified formatting. The entire file history of both patents is dedicated to claiming the invention of specified page formatting, or formatting based on user preferences, and the claims at issue are the result. Dow's aspersions that the invention is all dynamic creation of web pages, and that the claims are "gerrymandered" to relate to formatting of web pages, are simply incorrect.

A.  **The Inventors Claimed the "Specified Format" Aspect of Their Invention.**

On May 15, 1995, Andrew Ritchie and Jonathan Bradshaw disclosed a server system that was capable of performing, among other things, two important functions. The system can dynamically generate user-tailored HTML pages containing: (1) specified content in (2) a specified format. The system they disclosed is capable of selecting content and selecting format independent of each other based on some information previously sent by the user. The inventors later acknowledged that some programmers had developed systems capable of performing <u>one</u> of the two functions disclosed in their application, namely, dynamically generating HTML pages containing specified content. The inventors promptly disclosed this information to the U.S. patent office.[1] Logically, the inventors pursued their claims related to "specified formatting" from that point forward.

---

[1] Before any office action by the examiner, the inventors submitted an article that disclosed a system that dynamically generated html content in the form of an interactive questionnaire by a module using the Common Gateway Interface (CGI). See Northrop Decl. Ex. B, Information Disclosure Statement (Nov. 7, 1996), David Gee and Peter Wooliams, Novel Approaches to Automating the Gathering of Intelligence From the Online Community Through the Internet, Online Information 94 Proceedings, at 504 (1994) ("We have developed a set of modules for the NSCA's HTTPD server to allow the server to be a questionnaire server. These modules use the Common

**B.    The Specification Enables A System And Method That Generates HTML Dynamically Based On A Specified Format.**

The Summary of the Invention discloses a "first aspect of the present invention" is to output "commands executable by each browsing device so as to display viewable data in accordance with a *specified page format*." '737 pat., Col. 5, ll. 7-12 (emphasis added). Elsewhere, the specification teaches that in one embodiment "[o]nce a request has been received, first signals are processed by the serving station which represent the human viewable data. Second signals are received which represent *a selected display structure*. These two signals are processed in order to produce an HTML output." '737 pat., Col. 7, ll. 23-28 (emphasis added). The inventors also disclosed that the system could "adjust[] the way in which the data is actually formatted in response to a particular request." '737 pat., Col. 15, ll. 31-34.

In accordance with these disclosures, the original U.K. patent application claimed a serving method that effectively separates content from formatting and allows the user to control the relationship between the two. The claims filed on May 15, 1995 used functions to combine (1) content data with (2) formatting instructions using some (3) "third input data" that could be controlled by "user commands" to adjust the relationship between the content and its formatting.[2] Two examples of the "third input data" that are ultimately claimed include format identifiers and formatting type identification data. '737 pat., Col. 20, l. 18; '530 pat., Col. 19, l. 63.

---

Gateway Interface (CGI) of NSCA's HTTPD. This allows programmes to be used to construct replies to Mosaic requests dynamically.")

[2] The combination of dependent claims 20-23, as taught by the claims, describes this method of dynamically specifying formatting. In particular, claim 20 teaches a method that executes "locally executable instructions [e.g., functions] to combine specified database entries [e.g. content data] with specified formatting instructions [e.g., HTML tags]." Claim 21 states that the relationship between functions that combine content data and formatting data may be adjusted. Claim 22 then indicates that "third input data" can similarly be used to adjust the relationship between the request and the combination of content data and formatting data returned to the user (e.g., "a particular output string"). Finally, claim 23 indicates that third input data may be controlled by user commands. Northrop Decl. Ex. C, '530 File History, U.K. Patent Application No. 9509828.1, at 49.

**C.    The Entire File History Is Dedicated To Claiming a System and Method That Generates Html Dynamically Based On a Specified Format.**

Throughout the prosecution of the '530 and '737 patents, the inventors made it clear that one aspect of their claimed invention was dynamically generating HTML in a specified format for the particular user.

In response to the first rejection, the inventors differentiated the particular claimed invention by stating that in their invention "the nature in which viewable data is formatted may be made dependent upon user preferences."  Northrop Decl. Ex. D, '530 File History, 2/03/98 Office Action, at 9.  Later, the inventors further distinguished themselves by stating that, "the formatting of text/graphics data is not restricted to a single type (as taught by Meske) but is independently selected. . . . Such selection may be on the basis of user information provided from the browser (with or without the assistance of a user database in the server) but the invention is not so limited." Northrop Decl. Ex. E, '530 File History, 8/20/99 Office Action, at 5.  The inventors also stated that the references miss the advantage that "data may be formatted on the basis of previous information received from the receiving computer (the browser)."  Id. at 6.  Again, the patentees unmistakably communicated the nature of their claimed invention – user-selected formatting – to the PTO.

As a result, all of the independent claims in the '530 patent (claims 1, 2, 3, and 12) recite a method or system that outputs "viewable data in accordance with a specified page format" chosen from a "first specified page format" or a "second specified page format."

Later, when pursuing the '737 patent, the inventors chose not to limit themselves to format identifiers coming with the request for content.  They broadly claimed "receiving format identifiers" with a dependent claim more narrowly limited to receiving format identifiers "wherein said format identifiers are received from browsing devices with said requests for

specified content data." Northrop Decl. Ex. F, '737 File History, 11/01/01 Office Action, at 2. They described the broader invention as, "an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server." Northrop Decl. Ex. G, '737 File History, 12/16/03, Office Action, at 13.

As a result, all of the independent claims of the '737 patent (claims 1, 4, 7, 8, 9, 15, and 21) recite a method or system that "receives format identifiers identifying the type of formatting required." Thus, Ablaise's position on the scope of its invention has remained constant from its original disclosure in 1995, throughout the lengthy prosecution of the patents, and into this lawsuit.

## II.    TWO KEY POINTS OF LAW IGNORED BY DOW.

### A.    Claims Are Not Limited By Unclaimed Details In The Specification, Even Where The Specification Discloses Only One Embodiment.

Dow systematically fails to define claim terms in light of the intrinsic record. Instead, it examines the specification for non-infringement arguments, and then insists that those portions of the specification must be in the claims. This approach is diametrically opposed to decades of Federal Circuit precedent, confirmed one again in Phillips. The Phillips decision states,

> Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. (citations omitted). In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. (citation omitted) That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

Id. at 1323. Almost all of Dow's proposed constructions can be rejected simply by following this clearly established law. For instance, Dow invites error each time it merely repeats the claim term it is supposedly construing within its proposed definition, and then adds additional words from the specification.

**B.    Dow Never Identifies "Words Of Manifest Exclusion" "Intentional Disclaimer" Or "Disavowal Of Claim Scope" In The Specification.**

Most of Dow's constructions are based explicitly or implicitly on its assertion that each given feature in the specification is a "critical," "essential" or "required" feature of the invention. However, Dow never points to language within the specification indicating a "clear" disavowal of claim scope as required by Phillips, 415 F.3d at 1323. The Federal Circuit has held there to be no disavowal of claim scope in circumstances far more compelling than the words "will include" or "the system as a whole" latched onto by Dow in isolated phrases in this case. See, e.g. Gillette Co. v. Energizer Holdings, Inc., 405 F.3d at 1369, 1374 (specification referring to elements as an integral part of the "present invention" not enough to limit claims absent "words or expressions of manifest exclusion" to limit the scope of the claim); Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1366 (Fed. Cir. 2004) (statement in the specification indicating that an "'innovative cursor . . . is required' was not the use [of] words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") Accordingly, Dow is simply importing limitations from the specification into the claims in violation of Phillips.

**III.    PROPER CONSTRUCTION OF DISPUTED CLAIM LANGUAGE IN THE '737 PATENT.**

**A.    Storing Executable Functions.**

"Function" is a common term used to describe one aspect of computer software. Dow offers no evidence on the plain meaning of function. Dow then brushes aside the specification's definition of one type of "function" based on a 2007 Google search performed by its expert,

Pascal Chesnais.[3]  Dow Br. at 4; Chesnais Decl. ¶ 21.  This is improper.  In Phillips, the Federal Circuit instructed that claim terms are to be given "the meaning that term would have to a person of ordinary skill in the art in question *at the time of the invention, i.e., as of the effective filing date of the patent application.*"  Phillips, 415 F.3d at 1313 (emphasis added).  Chesnais's Google search merely returns web pages that currently contain the requested text string.  Furthermore, Dow provided no authority for why a Google search *of the proposed construction, and not the claim term*, provides any guidance as to the meaning of the claim term to a person of ordinary skill in the art.

The specification provides the necessary insight.  It states that a formatting function is "the smallest unit of instructions for producing a portion of HTML code."  '737 pat., Col. 12, ll. 46-48.  Dow concedes that functions consist of "a set of instructions," see Dow Reply Br. Ex. A at 2 ("An ordinary meaning of the term 'function' is a named set of instructions"), leaving only the question of whether those instructions are identifiable or must be named.  The specification never teaches that functions must be named but does teach that functions can be "identified" using an "index," a possibility excluded by Dow's requirement of a name.  See, e.g., '737 pat., Col. 15, ll. 62-65, Hicks 2nd Aff. ¶ 6.  The specification therefore teaches that the common term "function" is best understood as "an identifiable unit of computer instructions."  This is precisely the use of the specification—to understand the meaning of a claim term without importing claim limitations—that Phillips embraces.  Phillips, 415 F.3d at 1323.

Incredibly, Dow impeaches its own expert who rejected "set of computer instructions" based on a Google search, by admitting in its construction chart that a function has the ordinary

---

[3] It is notable that Dow has abandoned its reliance on technical dictionaries contemporaneous with the effective filing date of the invention when confronted by Ablaise pointing out that the definitions actually support Ablaise's proposed construction, not Dow's.  Ablaise Responsive Br. at 19-20, n.4.

meaning of "a named **set of instructions** . . . (Ex. A to Dow's Reply Br., p. 2).  Clearly, Ablaise's construction is correct.

> **1.    The claims do not recite "storing a universal family set of all available functions."**

Dow repeats the claim terms "storing" and "function" in its definition, and then  simply inserts the phrase "a universal family set of all available" where the claims says "executable."[4] In effect, Dow is asking this Court to construe "executable" as "a universal family set of all available."  That is nonsensical, and no further analysis is required to reject Dow's proposal. Hicks 2nd Aff. ¶ 7(1).

Dow's asserted justification for adding "a universal family set of all available" functions to the claim is that this is an "essential feature" of the invention based on the words "the system as a whole."  Dow Reply Br. at 3-4.[5]  The "system" described is that of the preferred embodiment not the invention as a whole.  Hicks 2nd Aff. ¶ 7(2).  Even statements concerning an integral part of the "present invention" have not been found to be limiting when the specification does not use "words of manifest exclusion" to limit the scope of the claim.  Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005).  Here, Dow fails to point to any unambiguous statements within the specification that indicate "a universal set of all available functions" is an essential or even necessary component of the claimed invention.

---

[4] Dow adds "family" to its construction within its reply brief in order to "clarify" that its proposed construction does not require that the system maintain "every known function."  See Dow Reply Br. Attachment A, n.1.  Dow continues to argue, however, that the system must incorporate "all available functions."  It is unclear how adding "family" changes Dow's position.

[5] Dow inexplicably attempts to place the burden on Ablaise to point to the location of the specification where the inventors _do not say_ the universal set of functions is required.  Dow Reply Br. at 3.  This argument has no basis in law.  In the absence of an explicit  statement that a feature is required, there is no basis to limit the clear claim language.

### 2.    Functions can be identified by more than just a name.

Dow commits the logical fallacy it accuses Ablaise of committing.  Dow insists that because some functions are named, *all* functions must be named.  While it is true that functions can be identified by a name, Dow fails to rebut Ablaise's showing that functions can also be identified by index, memory location, or other mechanism.  Ablaise Responsive Br. at 19.  It is therefore improper to limit functions to being named.

### 3.    Not all functions create a portion of code.

In the last sentence of its section, accompanied by a footnote, Dow attempts to resurrect its position that a function must, when executed, create a portion of code.  Dow Reply Br. at 5, n.3.  However, Dow concedes Ablaise's analysis, Ablaise Responsive Br. at 20, that the specification articulates numerous examples of functions that do not generate code.  For example, the specification discloses functions which only read from text and/or graphics databases.  Id.  It is therefore improper to limit "function" to functions that "when executed create a portion of code."

### B.    In Response To Identifying A Request For Specified Content Data And A User Identifier; (A)…(E).

The disagreement between the parties with respect to this claim term revolves around the meaning of the word "request."  "Request" is a common term that in no way inherently includes a "format identifier."   Chesnais's own publications indicate that he understands the term "request"[6], but neither he nor Dow make any attempt to ascertain the plain meaning of the word.  However, nearly every client-server protocol utilizes a request, including several that existed in 1995.  Hicks Aff. ¶ 9.  Moreover the claims of the '530 patent demonstrate that the inventors

---

[6] *See, e.g.*, Northrop Decl. Ex. H, Pascal R. Chesnais, "Canard: A Framework for Community Messaging," *iswc*, p. 108, First International Symposium on Wearable Computers (ISWC '97), 1997 (Chesnais uses the term "request" numerous times to refer to standard computer-based communications).

knew how to expressly limit a claim to include information corresponding to a format preference, and they chose not to in the later-filed '737 patent. See, e.g., '530 pat., Col. 19, ll. 62-63 ("said request including formatting type identification data"). Consequently, the term should not be further defined.

### 1.    Dow ignores the claims when construing "request."

Dow contends that the word "request" should mean "the request was transmitted by a browsing device and includes a format identifier." Dow Opening Br. 25-29. That definition does nothing to define the term request. Instead its proposed definition merely restates the word request and then adds limitations not present in the claim. This recurring problem for Dow violates the Federal Circuit's clear law that "Specifications teach. Claims claim." SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc).

When one properly focuses on the claim language, it is apparent that a request is simply a request. The claim describes identifying (1) a request for specified content data; and (2) a user identifier. In response to the identification of these two things, the system "receiv[es] format identifiers identifying the type of formatting required." The claim does not limit the invention to how, or from where, a format identifier is received. Dow correctly recognizes that there "is no inconsistency" between the claim limitations and an embodiment that receives a format identifier from the request by parsing a request. Likewise, there is no inconsistency between the claim limitations and an embodiment that receives format identifiers from a database in response to identifying a user identifier – an embodiment disclosed in the specification. In short, the words mean what they say. The claimed system identifies (1) a request for specified content data; and (2) a user identifier. It does not recite separately identifying a format identifier in the request.

> **2.    Comparing the term "request" with other claim language demonstrates a "request" need not include a format identifier.**

The term "request" is defined by claim language as not necessarily including a format identifier. This method of construction is consistent with the *en banc* statement in Phillips that "the use of the term within the claim provides a firm basis for construing the term." Phillips, 415 F.3d at 1314. In Phillips, the Court determined that the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel." In the instant case, the use of the phrase "wherein said format identifier is received with said request" strongly implies that the term "request" does not inherently include a format identifier. '737 pat., Col. 20, ll. 27-31.

In addition, the doctrine of claim differentiation provides a presumption that Dow's construction is incorrect. Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation is not present in the independent claim."). Dow argues that the presumption does not apply because claim 2 is not rendered superfluous by Dow's construction. Dow Reply at 12. However, the inventors used the same claiming structure elsewhere, and the term "request" should be construed consistently throughout the patent. Phillips, 415 F.3d at 1315. For example, independent claim 9 claims "identifying a request for specified content data." Dependent claim 10 adds only the limitation "wherein said format identifiers are received from browsing devices with said requests for specified content data." '737 pat., Col 22, ll. 54-60. Claim 10 does not include "viewable data is served to a browsing device (as did claim 2). That limitation is already in claim 9. Compare '737 pat., Col. 22, ll. 56-57 with '737 pat., Col. 22, ll. 51. Dow's construction would render claim 10 superfluous. See also Col. 23, ll. 47-57 (claims 15 and 16 follow the same structure

such that claim 16 would be rendered superfluous by Dow's construction).  Thus, there is a legal presumption that Dow's construction is incorrect.

> **3.     The specification does not limit the claims to a format identifier included with a request**.

Dow repeatedly asserts that using the words "**will** include" in the specification instead of "**may** include" creates a limitation that "request" must be defined as including a format identifier.  As a matter of law, however, these words do not amount to "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1366 (Fed. Cir. 2004) (internal quotations omitted) Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1371 (Fed. Cir. 2005).  Dow cites no case law to support its assertion that using the words "will include" in the specification should limit all of the claims.  Instead Dow is simply cherry picking information from the specification in an attempt to grasp onto a potential noninfringement argument.[7]

In addition, the specification discloses that format identifiers may come from a database.  See Ablaise Responsive Brief at 25-26 addressing '737 Pat., Col. 15, ll. 31-34 and Col. 16, ll. 8-14; Hicks Aff. ¶ 10(2).  Dow effectively concedes this point by admitting that information that identifies an index is a format identifier.  See Dow. Br. at 8 (stating that a "formatting identifier identifies an index"); see also id. ("index identifier (i.e., a format identifier)").  The patent specification, as cited by Dow, discloses a system in which "*an actual selection of an index [is] made in response to information stored about the particular user.*"  '737 pat., Col. 18, ll 8-11.

---

[7] Dow does not even consistently use its own unsupported legal theory that the language "will include" necessitates the importation of a limitation from the specification.  For example, Dow quotes a portion of the specification discussing a preferred embodiment, which states the "URL will include. . . an element identifying the type of formatting required."  Col. 14, ll. 3-7 That same sentence also states that the "URL will include . . . a check sum, so as to reject URLs corrupted during transmission."  Id.  If Dow actually believed that the term "will include" necessitates a claim limitation, then it would have also required a check sum to be part of the request.  But such a construction would highlight the absurd constructions that would follow from Dow's approach.

Thus, a format identifier may be stored in a user database. The patent is perfectly clear on this point, and one of ordinary skill would recognize this teaching.

**4.    The prosecution history does not limit the claims to a format identifier included with a request**.

In order for the prosecution history to limit the claims there must be a "clear and unambiguous disavowal" of claim scope. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1124 (Fed. Cir. 2004) (vacating district court construction for incorrectly concluding that a statement in the file history represented clear and unambiguous disclaimer). As the Federal Circuit noted in Phillips, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is far less useful for claim construction purposes." Phillips, 415 F.3d at 1317. Dow's burden is particularly high given the plain language of the claims as described above.

Despite this high burden, Dow incorrectly asserts that the inventors clearly and unambiguously disavowed claim scope in the '737 file history when arguing around the Wolff art.[8] Dow points to the following section of the prosecution history:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.
>
> . . .
>
> As will be explained in more detail below, it is not believed that the cited Wolff reference in any way teaches serving the same text/graphic content in different viewable page formats – depending upon received requests incorporating respectively different format identifiers.

---

[8] Notably, this remark was made in the context of Wolff, which has nothing to do with page formatting. See Ablaise Responsive Br. at 26-29. Accordingly, the inventors amended the independent claims so that the format refers to "locations of said text and/or graphics within a page." Id. This differentiates the formatting described in the invention, e.g. web page formatting, from the formatting described in Wolff, e.g., transmission protocol formatting (fax or HTML). There was no disclaimer of the way format identifiers were received.

Northrop Decl. Ex. H, 12/16/03 Office Action, at 13; see Dow Reply at 9.

These statements do not unambiguously disclaim the scope of the invention. Dow asserts that these statements unambiguously define **when** format identifiers must be received. These statements create no such restriction. In the database embodiment disclosed in the specification, format identifiers are stored in a database. These format identifiers are saved in the database based on previous requests from a client. Those previous requests may have occurred weeks before the instant request to which the system is responding. Neither remark unambiguously states that the format identifier can never be included in a previous request.

Even assuming the statements were clear, the second statement differentiates Wolff from the more narrow dependent claims that require a format identifier to be included with the request for specified content data. Dow simply asserts that the second statement applies to *all* of the pending claims in front of the examiner. This interpretation of the second statement is illogical given two then-pending dependent claims specifically included a limitation that the format identifier must be received with the request. If Dow was correct, then the examiner would not have allowed the claims as presented. Instead, the examiner would have required the inventors to limit the open-ended independent claims with the language used in the dependent claims that expressly required the format identifier to be included with the request.

The Federal Circuit addressed a similar fact pattern in Innova, 381 F.3d at 1124 (Fed. Cir. 2004). In that case, the examiner rejected the claims as anticipated based on prior art. In response to the rejection, the inventors made an argument differentiating the prior art that could have been read to disclaim the use of "flanges" despite a claim that specifically allowed the use of "flanges." The examiner allowed the claim related to flanges without giving a reason for its allowance. The Federal Circuit stated that "the record finally reflects the examiner's

acquiescence to the claim language chosen by the applicant." Id. Based on this acquiescence, "[t]his is not clear evidence of the patentee's disavowal of claim scope." Id. Here, the examiner separately rejected the independent and dependent claims based on Wolff. Northrop Decl. Ex. I, '737 File History, 9/17/03 Office Action. The examiner read the statements in question, and then allowed the claims at issue today. Clearly the examiner acquiesced to broad independent claims, and dependent claims limited to receiving format identifiers with the request. There was no disavowal of claim scope.

Finally, when differentiating independent claims that merely claim the step of *receiving* format identifiers, e.g., then-pending claims 2 and 14, the inventors were careful not to limit the claims in the way Dow suggests. Northrop Decl. Ex. G, '737 File History, 12/16/03 Office Action, at 14. The inventors reiterated that those claims are different than Wolff because the "locations of the text and/or graphics which depend upon the particular format identifier *received* by the processing means." Id. (emphasis added). There was no disavowal of the different ways a format identifier may be *received.*

### 5. Dow's new attempt to read out "a request to retrieve and execute a specified file" should be rejected.

Dow seeks to add the negative limitation that a request cannot be "a request to retrieve and execute a specified file." The use of the word "request" in even this negative limitation demonstrates again that Dow is not defining a claim term. Dow is therefore incorrect, but its rationale will be addressed.

Dow takes the position that the inventors "disparaged" the prior art and consequently disavowed the use of that prior art. However, a statement in the specification indicating that CGI.bin programs existed is not a disparagement of the properties of those programs. That statement is merely identifying existing technology and in no way disclaims their use. Hicks

Aff. ¶ 11. By way of analogy, the inventors did not disavow the use of an HTTP server by disclosing that an HTTP server was well known in the prior art. Moreover, there is nothing in the supposed disclaimer that states anything about retrieving and executing a specified file or script.

The only case Dow cites for the proposition that the retrieval and execution of a specified file was disavowed is <u>Honeywell Int'l, Inc. v. ITT Indus., Inc.</u>, 453 F.3d 1312 (Fed. Cir. 2006). In that case, the Federal Circuit determined that the claim term "electrically conductive fibers" would normally include carbon fibers, but the inventors disavowed this scope by criticizing the electrical conductivity properties of carbon fibers as compared to other fibers. <u>Id</u>. at 1319. The inventors actually stated that using carbon fibers for conductivity would cause problems. <u>Id</u>. No such criticism of CGI.bin programs exists in the instant case. Consequently, the inventors did not expressly disavow their use.

**C.    Receiving Format Identifiers Identifying The Type of Formatting Required.**

**1.    Receiving.**

Ablaise contends that the term "receiving" means "receiving." Ablaise never contended that the term "receiving" means "reading from a database." On the contrary, reading information from a database is a distinct step from receiving information from a database. In particular, a program requests information from a database and the database then reads the information from its tables. Hicks 2nd Aff. ¶ 14. Subsequently, the program receives the result set from its request to the database. <u>Id</u>.

Dow's construction of "receiving," first proposed in its reply, is to "acquire something transmitted." Dow provides no support for this definition. It simply asserts that is the meaning given in the specification without pointing to any language using the words "acquiring" or

"transmitted." This proposal substitutes an easily understood term "receiving" with the more complex terms "acquiring" and "transmitted." This construction will only create a later fight over the meaning of the terms "acquire" and "transmitted."

### 2. Format identifiers.

The claims in the '737 patent indicate that a format identifier identifies the type of formatting required. The claim language describes that the format identifier must identify a formatting preference for the specified content data, because "in response to identifying . . . a user identifier," the system received format identifiers identifying the type of formatting is "required." The type of formatting is "required" by the user. In addition, there must inherently be more than one type of formatting in order for the identifier to identify a particular type of formatting. Consequently, "format identifier "is an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data." Hicks 2nd Aff. ¶ 16.

Dow argues that the claim cannot be construed to allow for format identifiers to exist in a database because "reading user preference information" must be different from "receiving format identifiers." Dow Reply at 16. As Ablaise stated before, reading user preference information is different from receiving format identifiers. It is a two-step process. The database program reads user preference information and after the database reads the information, the processing program receives user preference data based on the reading performed by the database. Format identifiers may be one of many pieces of information included in the data received by the program. Ablaise does not contend that the steps are synonymous. Hicks Aff. ¶ 14.

The fact that the format identifier represents a user's format preference is not only part of the claim language, but it is also supported by the specification and prosecution history. As has already been discussed in detail in section I.B., the disclosure of user-selected formatting

preferences in the original U.K. application, the specification, and the file history of both patents. In the original U.K. patent, the inventors disclosed a system of serving pages that enabled a user to "specify preferences such that the system becomes more tailor-made and specific to that particular user." '737 pat., Col. 16, ll. 61-63.  The inventor's disclosure of a system that could receive content data and format data independently and adjust the relationship between the two through some received "third input data" controlled by a user enables one of ordinary skill to dynamically generate html based on a user's format preference.  By allowing the claims, the examiner agreed that in the claimed invention, "two different claims requesting the same content data from the same server may receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server." Northrop Decl. Ex. G, '737 File History, 12/16/03 Office History, at 13.

Now Dow criticizes Ablaise for seeking to "expand the scope of claims through statements made during prosecution."  Dow Reply at 18.  Ablaise's construction is exactly the opposite.  Ablaise narrowed the claimed invention by claiming user-preferred formatting instead of the broader dynamic page generation it disclosed.

### 3.     Type of formatting required.

Ablaise proposes that the term "type of formatting" means "a layout or presentation of text and/or graphics on a page."  The specification refers to the ability to "generate a wide range of page layouts from a modest set of (HTML) tags."  '737 pat., Col. 3, ll.10-11.  It also describes the push toward "formatting structures" on the Internet that "improve[] the presentation of what would be considered as textual data."  '737 pat., Col. 1, ll. 55-59.  These references in the specification comport with the ordinary meaning of the term "formatting."

Dow asserts that the phrase "type of formatting required" means "indexed function string."  This is wrong for three reasons.  First and foremost, no person of ordinary skill would

define "type of formatting" as an indexed function string.  Hicks Aff. ¶¶ 18-19.  Second, Dow's construction of "type of formatting required" is the same as its construction of "set of stored functions."  Dow Reply at 19.  They can't both be indexed function strings.  Third, while even a single embodiment is not limiting, see Phillips, 415 F.3d at 1323, Dow's construction would exclude a second embodiment.  The specification specifically contrasts the "preferred embodiment" that uses a "string of functions" with an embodiment that selects an HTML template in response to a request so it can be used to process content data with the formatting information within the template.  '737 pat., Col. 11, ll. 16-33; see also Hicks Aff. ¶ 19-20. Consequently, Dow's nonsensical construction should be rejected.

> ### D.    Selecting a Set of Stored Functions In Dependence Upon a Received Format Identifier and Said Read User Information.

Dow's Reply Memorandum does not dispute that "selecting" means "selecting."[9] Therefore, the term "selecting" need not be construed by this Court.  See Ablaise Responsive Br. 32-35.  Dow also leaves undisputed that the claim term "set" has a plain and ordinary meaning to one skilled in the art of simply "one or more of an entity."  Ablaise Responsive Br. 32, 35-36.  It follows that "selecting a set of stored functions in dependence upon a received format identifier and said read user information" means "selecting one or more functions based upon a received format identifier and said read user information."  Despite this seemingly simple analysis, Dow insists this Court adopt the construction "choosing a particular stored and indexed function string where each element of the set is selected on both the received format identifier and said read user

---

[9] The only place Dow reasserts its position that "selecting" means "choosing" is within its attached Exhibit A.  Dow Reply Br. Ex. A at 8.  Dow's expert also provides an attempted refutation of the plain and ordinary meaning of "selecting" within the art, See Chesnais Decl.¶ 30.  However, as explained by Hicks, selecting is a commonly understood word for describing certain actions taken by a computer, and is not synonymous with choosing.  See Hicks Decl. ¶ 21.

information, which are separate and distinct."[10]  Dow Reply Br. Ex. A at 10.  Dow's provides no

legal support for its analysis, and misinterprets specification.  Its construction should be rejected.

        **1.**    **Dow's position that a "set of stored functions" must be an "indexed**
                **function string" is without merit**.

Dow's entire justification for construing "set of stored functions" is that the preferred

embodiment discusses "indexed function strings."  Dow Reply Br. at 19; Chesnais Decl. ¶ 31 (A

set of stored functions "would have been understood by a person of ordinary skill in the art at the

time of the alleged invention to have a meaning of a 'a particular stored and indexed function

string' . . . . because the specification consistently and repeatedly teaches that in the claimed

embodiment").  Limiting the claims on the basis of examples within the specification is wrong as

a matter of law.  Phillips, 415 F.3d at 1323.  The claims simply do not state "indexed function

string," and that should end the inquiry.

Dow's only attempt to demonstrate that "function string indexes" are even analogous to,

or an example of, a "set of functions" is to point out that the two terms appear within the same

paragraph.  Dow Opening Br. at 38; Dow Reply Br. at 20.  This paragraph, as previously argued

by Ablaise, only supports the position that all "sets of functions" cannot exclusively be "indexed

function strings."  Ablaise Responsive Br. at 35-36.  Indeed, Dow does not refute that the

specification discloses many different forms for a set of functions.  Ablaise Responsive Br. 35-

36.  Nor has Dow provided any reasoning to import the limitation that a set of functions need be

"indexed."  In fact, the alternative "template embodiment" does not require indexed function

strings.  Hicks Aff. ¶¶ 24-25.

In the alternative, Dow asserts that "indexed function strings" and "indexing" are critical

elements of the invention and therefore should be imported as a limitation to "set of functions."

---

[10] Dow rightfully abandons its opening brief position that "a particular indexed function string" must be "from a set
of indexed function strings."  Dow Opening Br. at 13.

However, Dow's listing of each use of an "indexed function string" within the preferred embodiment does not constitute "words of manifest exclusion" sufficient to limit the scope of the invention.  Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005) (district court erred by limiting the broad claim "razor" to three blades in part because the specification referred to "three," "third," and "tertiary" approximately thirty times in its two page specification).  "Indexed function string" never appears in the asserted claims, nor has Dow shown that a "set of functions" is by nature an "indexed function string."  Even if "*indexed function strings*" was an essential element of the invention, this itself does not give Dow license to read this limitation into an unrelated claim term.  MBO Labs., Inc. v. Becton, Dickonson,& Co., 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) (it is "improper to impose a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (citations removed).

> **2.**    **Dow's position that each function must be selected in dependence upon a received format identifier and read user information is without merit**.

The claim merely requires the set of functions—not individual functions—be selected in dependence on both a format identifier and read user information.  This is also the only reading consistent with the specification.  Indeed, even the portion of the specification Dow relies upon identifies that formatting functions are selected in dependence upon supplied "formatting information."   There is no reference to the functions being selected on the basis of user information.  '737 pat., Col. 15, l. 63 – Col. 16, l. 2.  The specification later mentions that the online processor "*may also* make use of [read user information] in order to adjust the relationship between indexes and their associated function strings and data."  Id. at Col. 16, ll. 8-14 (emphasis added).  In fact, user information is often used within the preferred embodiment to call specific sets of functions independent of received formatting information.  See, e.g., Id. at

Col. 14, ll. 8-31 (user preference information controls the selection of specific error or content functions); Id. at Col. 16, l. 42 – Col. 17, l. 14 (stored user preference information determines selection of functions). The tandem of the selected functions, some of which are selected by formatting information only, some by user information only, and some by both—the set of functions—are combined to generate viewable data. Id. at Col. 7, ll. 22-28. The set, therefore, is a product of a received format identifier and read user information even if its individual parts are not all a product of both forms of data. If the inventors had truly intended to claim a system where each function was selected in dependence upon a received format identifier and read user information there would be no reason to claim a set of functions, they would have merely claimed individual functions. Dow's proposed construction should therefore be rejected.

## IV.    PROPER CONSTRUCTION OF DISPUTED CLAIM LANGUAGE IN THE '530 PATENT.

### A.    Requests from browsing devices that define a request for specified viewable data.

Dow does not define this phase, or any word in it. It simply redrafts it to read "a request including an identifier identifying certain viewable data in addition to including formatting type identification data, wherein the request is not a request to retrieve and execute a specified file." However, the term "request" is a common term in the art that does not require construction, See Section III.B., and should remain consistent throughout the patents. See Phillips, 415 F.3d at 1315. "Viewable data" and "formatting type identification data" are already present in the claim and do not need to be repeated in the construction. Repeating them is not a definition of anything. Dow further asserts that the specification discloses an "identifier identifying certain viewable data", so it simply adds these words to the claim in violation of well settled law. See Phillips, 415 F.3d at 1323. Finally, Dow's new attempt in reply to define "request" as "not a request to retrieve and execute a file" is just wrong. The claim language clearly calls for

requests for viewable data that include formatting type identification data. Dow's "construction" has nothing to do with the clear meaning of this claim language and should be rejected.

### B.    Formatting type identification data.

Dow has abandoned its original proposed construction of "an identifier identifying a certain file structure." Accordingly, Dow concedes that the language it dropped, "a certain file structure," is incorrect. Dow's new construction of this phrase uses all of the same words in the claim but in a different order – "data identifying a type of formatting." In effect, Dow proposes that the term does not require construction. Ablaise gave this phrase a useful and correct definition in its opening brief, but if Dow is now withdrawing its request to construe the term, Ablaise will agree to simply give the words their plain and ordinary meaning. One of ordinary skill in the art would readily understand these words without further definition.

However, Ablaise's construction correctly describes how one of skill in the art would understand the claim, which could be useful for the Court or a jury. In claim 1, "formatting type identification data" indicates a "specified page format" requested by a browser. '530 pat., Col. 19, l. 59. The server then selects "a specific on of said types of formatting data [a set of mark-up tags] in response to said formatting type identification data." '530 pat., Col. 20, ll. 4-5. This selection is made in order to produce one of at least two potential "specified page format[s]" requested by the browser. '530 pat., Col. 20, ll. 14-19. Dow is apparently confused by the basic operation of the client-server communication involved. Specifically, Dow misses the simple fact that the "formatting type identification data" represents the selection of a specified page format, and is also used to select an appropriate set of mark-up tags to produce the specified page format. Thus, in plain terms it directly correlates to the choice of a web page layout, the selection of HTML tags, and the generation of a web page in accordance with the original choice. Hicks Aff. ¶ 27. Thus, "data corresponding to a specified page format chosen from at least two page

formats available to the requesting browsing device for specified viewable data" is a correct definition.

### C.    Formatting types of data.

Dow feigns confusion as to Ablaise's position.  However Ablaise has consistently maintained that "formatting types of data" is a simple term.  A person of skill in the art knows that web pages are formatted with HTML tags.  Hicks Aff. ¶ 29.  Not surprisingly, the specification describes formatting through the use of "mark-up languages" and provides the most common example – HTML tags.  '530 pat., Col. 2, l. 32 – Col. 3, l. 8.  Thus, Ablaise's proper construction of the claimed plurality of formatting types of data as, "sets of mark-up tags, such as HTML tags."[11]

### D.    Maintaining a plurality of formatting types of data.

Ablaise's responsive brief demonstrates that "maintaining" is a simple term that does not require construction but includes storing in any acceptable location such as code, a flat file or a table.  Hicks Aff. ¶ 31.  Thus, maintaining may be done in a table, but not all maintaining is done in a table.  Dow fails to rebut this showing.  Dow's insistence on a table simply adds that limitation to the claim.

Moreover, Dow is internally inconsistent.  Dow contends that "formatting types of data" are "file structure data" citing '530 pat., Col. 8, ll. 29-36.  Then, it leaps to the file history to find a parenthetical reference to table 1103.  However, back in the relevant part of the specification ('530 pat., Col. 8, ll. 29-36), the file structure data is maintained in "file structure source 407"

---

[11] Dow does not oppose this construction in the '737 patent, but for some reason insists that the '530 patent should be construed differently to require "file structure data."  However, in the lone specification reference cited by Dow, "file structure data" supplies the format for an HTML file, a web page.  Col. 8, ll. 32-36.  In that context, the somewhat ambiguous phrase "file structure data" is used synonymously with HTML tags.  Hicks Aff. ¶ 30.

represented by an oval in Fig. 4.  There is no indication that this must be a table.  Dow is simply manufacturing claim limitations.

> **E.**     **Selecting a specific one of said types of formatting data in response to said formatting type identification data.**

Dow's general purpose dictionary notwithstanding, computers have no ability to "choose."  They select.  Hicks Aff. ¶ 21.  In this case, the computer selects formatting data required to produce a chosen specified page format requested by a browser.

## CONCLUSION

Ablaise respectfully requests that the Court enter an order in accordance with Ablaise's proposed constructions.  For the Court's convenience, Ablaise has again provided a chart of the parties' respective constructions.  Northrop Decl. Ex. A.  Ablaise's constructions have remained the same, however some of Dow's have changed.  Moreover, Dow's chart is not appropriate.  In addition to extending its brief by characterizing each parties' arguments, Dow mischaracterizes Ablaise's constructions and support.  Ablaise's chart provides a non-argumentative presentation of the parties' requested constructions.

DATED:  May 30, 2007                    **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

Jeffrey J. Downey (#427010)
T. Monique Jones (#973762)
1875 Eye Street, NW
Washington, D.C. 20006-5409
Tel:  (202) 775-0725
Fax:  (202) 223-8604

Ron J. Schutz
Jake M. Holdreith
Cyrus A. Morton
Trevor J. Foster
Seth A. Northrop
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel:  (612) 349-8500
Fax:  (612) 339-4181

Thomas G. Scavone
Niro, Scavone, Haller & Niro, Ltd.
181 West Madison Street, Suite 4600
Chicago, IL 60602-4515
Tel:  (312) 236-0733

**ATTORNEYS FOR PLAINTIFF
ABLAISE LTD. AND GENERAL INVENTIONS
INSTITUTE A, INC.**

MP3 20227527.2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Ablaise LTD. And General Inventions Institute A, Inc.'s Markman Sur-Reply Brief in Support of its Proposed Claim Construction was served this 30th day of May, 2007 via electronic means to the following:

>
> Creighton R. Magid
> Dorsey & Witney LLP
> 1001 Pennsylvania Avenue, N.W.
> Suite 400 North
> Washington, D.C. 20004
> Ph: (202) 442-3000
> Fx: (202) 442-3199
>
>
> Devan V. Padmanabhan
> Sri K. Sankaran
> 50 South Sixth Street, Suite 1500
> Minneapolis, MN 55402
> Ph: (612) 340-2600
> Fx: (612) 340-8856
>
>
> Attorneys for Plaintiff

Jeffrey J. Downey