UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DOW JONES & COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 1:06CV01014** |
| v. | ) | |
| | ) | **Judge James Robertson** |
| ABLAISE LTD ("Ablaise") | ) | |
| GENERAL INVENTIONS | ) | |
| INSTITUTE A, INC., ("GIIA") | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | | |
| DOW JONES REUTERS | ) | |
| BUSINESS INTERACTIVE, LLC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 1:06CV01015** |
| v. | ) | |
| | ) | **Judge James Robertson** |
| ABLAISE and GIIA | ) | |
| Defendants. | ) | |
| _____ | ) | |

State of Massachusetts
County of Middlesex

**SECOND AFFIDAVIT OF CHRISTIAN B. HICKS
REGARDING CLAIM CONSTRUCTION**

1. My name is Christian Hicks.  I have previously submitted an affidavit in this case.
My qualifications and prior testimony are set forth in my prior affidavit.

2. I have reviewed Dow Jones's Reply Memorandum Concerning Claim Construction
(the "Dow Reply") and the Declaration of Pascal Chesnais (the "Chesnais
Declaration") relating to the disputed terms in US Patent 6,295,530 (the "'530
Patent") and US Patent 6,961,737 (the "'737 Patent").  I will refer to these patents as
the "patents-in-suit".  Because the specifications for the patents-in-suit are so similar,
I will cite to the specification of the '737 Patent.

1

3. Although I am not a lawyer, I have been advised by attorneys on this case (and other cases) about the ways in which claims should be construed. I disagree with many of the conclusions of both the Dow Reply and the Chesnais Declaration, as set forth below.

**Recurring Flawed Arguments in the Dow Reply and the Chesnais Declaration**

4. I will address the disputed claim terms individually. However, before I start, it is worth noting that the Dow Reply and the Chesnais Declaration use particular flawed arguments repeatedly. Such flawed arguments include:

    **1. Attempting to limit the claims to one of multiple disclosed embodiments.** The inventors of the patents-in-suit clearly disclosed multiple embodiments:

> **In the present embodiment** the viewable data is retained on a database and signals are read from the database, representing said data, for processing in combination with second signals representing the way in which the information is to be formatted on the page. **In a possible configuration**, HTML code could be held as a template with with gaps therein for the actual viewable data, such that, in response to a request being made, the viewable data could be identified and interlaced with the formatting HTML instructions. **However, in the preferred embodiment**, a plurality of executable functions are provided at the server such that, in response to a particular request being made, a string of functions are executed  resulting in calls being made to appropriate databases in order to obtain viewable information. (′737 Patent 11:17-33, emphasis added).

This single passage makes clear that the written description discloses at least one embodiment **other** than the preferred embodiment. This additional embodiment is centered around the use of templates. Despite this, the Dow Reply and the Chesnais Declaration repeatedly attempt to limit the claim terms in ways that are specific to the preferred embodiment. It is generally not appropriate to limit the meaning of claim terms by using the preferred

2

embodiment, but it is especially inappropriate when the written description clearly discloses another embodiment.

2. **Attempting to encapsulate multiple claim limitations in a single term.** Each of the claims in the patents-in-suit has multiple limitations. The Dow Reply and the Chesnais Declaration repeatedly attempt to construe terms to encapsulate limitations provided by **other** language in the claim. Insofar as other language in a claim provides a limitation, the claim should be interpreted to rely on that language for the limitation. There is simply no need for **every** claim term to encapsulate **every** limitation of the claim. In my analysis, I focused on how one skilled in the art at the time would have understood each particular term.

**Terms of the '737 Patent**

5. **"Storing executable functions":** The correct construction of "storing executable functions" is "storing at least two executable functions", where a function is "an identifiable unit of computer instructions". One of ordinary skill at the time would have understood this construction to be correct.

6. A "function" is a unit of code. It needs to be identifiable so that the function can be "called" by other parts of the program. A function can be identified by a number of different mechanisms. Code consists of computer instructions. "FIG. 3 details the serving host identified in FIG. 2, including a processing unit and a random access memory for storing **instructions executable by said processing unit**". ('737 Patent 5:54-56, emphasis added). Accordingly, the term "function" is correctly construed as: "an identifiable unit of computer instructions".

7. The Dow Reply and the Chesnais Declaration insist that the proper construction of this term is "storing a universal family set of all available functions which may be

3

used in order to generate portions of HTML code". When we examine this proposed construction, it quickly falls apart:

1. *The plain and ordinary meaning to one of ordinary skill at the time:* Obviously, one skilled in the art at the time would not define "storing executable functions" as something as byzantine as "storing a universal family set of all available functions which may be used in order to generate portions of HTML code." "Storing" and "functions" were common terms in the art and well understood in 1995. Almost every programming language has "functions", and every computer user (and certainly every programmer) knows what it means to store things on a computer. There is simply no reason why someone skilled in the art at the time would presume that "storing executable functions" would require storing a "universal family set of all available functions", or that such functions would be restricted to those that are used to generate HTML.

2. *Limitations placed on the meaning by the specification or file history:* Given how fundamental and straightforward the disputed term is, one would expect it to keep its plain and ordinary meaning unless there were some clear indicator to the contrary in the specification or file history. Neither the specification nor the file history contains any explicit definition of "storing executable functions" by the inventors. Neither the specification nor the file history contains any explicit disclaimer of the plain and ordinary meaning. Nor are the complex requirements that Dow Jones seeks to attach to this term essential to the functioning of the invention.

   The Chesnais Declaration attempts to justify its construction as follows: "The '737 patent teaches that the 'system as a whole includes a universal family set of all the available functions' and that function strings are

4

assembled from the 'universal family set of all the available functions. Id. At col 12, ll 49-50" (Chesnais Declaration para. 19, underline in original). One skilled in the art would know that the "system as a whole" in the passage that the Chesnais Declaration points to is merely the one of the disclosed embodiments. Nothing in this passage indicates that the inventors intended to deviate from the plain and ordinary meaning of "storing" or "function". Additionally, the referenced "system as a whole" has nothing to do with another disclosed embodiment (the "template embodiment"). The "template embodiment" still uses software and of course uses functions but would have no need for a "universal family set of all available functions which may be used in order to generate portions of HTML code."

8. I also note that the Chesnais Declaration criticizes Ablaise's proposed construction on the grounds that the proposed construction does not generate any hits when entered into a Google search. "This is incorrect as evidenced by the fact that a Google search of the phrase 'identifiable unit of computer instructions' yielded zero hits." (Chesnais Declaration para. 21). I have been advised that claim construction is focused on what people skilled in the art would have understood at the time of the invention. Google searches merely provide information about what text strings appear on the World Wide Web today. Further, I note that the Chesnais Declaration does not attempt to vet its own proposed constructions in a similar way. I have performed Google searches on some Chesnais Declaration proposed constructions, and not surprisingly, they generate zero hits as well. I have not attached any of the search results as exhibits, because such search results are useless to the claim construction process.

9. **"A request for specified content data":** A request for specified content data is

simply what it says.  The term is so straightforward that it requires no additional construction.  One skilled in the art in 1995 would have had no trouble with any of the words in the term.  For example, every client-server protocol (including several such protocols used in 1995) involved "requests".

10. The Dow Reply and the Chesnais Declaration insist that this simple term be construed to mean the following: "a request for specified content data, wherein the request was transmitted by a browsing device and includes a format identifier that is separate and distinct from the user identifier."  Such a construction is unreasonable:

1. *The plain and ordinary meaning to one of ordinary skill at the time:*  Since Dow Jones' proposed construction of "a request for specified content data" **begins with** "a request for specified content data" and then adds additional limitations from the specification, Dow Jones' proposed definition is obviously nowhere near the plain and ordinary meaning to one skilled in the art at the time.

2. *Limitations placed on the meaning by the specification or file history:*  The Dow Reply and the Chesnais Declaration argue that the "wherein..." limitations are appropriate by pointing to various locations in the specification, as well as communications in the file history relating to the Wolff art.  Dow Jones' efforts to restrict the claim term to the preferred embodiment are inappropriate.  Once again, there is a specifically disclosed embodiment that defies Dow Jones' proposed limitations.  "In addition to use the user database to confirm user validity and to record actions made by the user (possibly for billing purposes) the on-line processor 301 may also make use of information read from the user database in order to adjust the relationship between indexes (1106, 1109, 1110) and their associated function strings and data

6

(1107, 1108, 1111)." ('737 Patent 16:8-14). The second half of this quotation --
the "in order to adjust the .... data" part -- refers to adjusting the formatting of
the data. The specification makes this clear when it says, "Thus, it is possible
to adjust the relationship between indexes and strings, thereby adjusting the
way in which the data is actually formatted in response to a particular
request." ('737 Patent 15:31-34). In other words, this part of the specification
discloses using "information read from the database" to adjust the formatting
of the data. This discloses retrieving the format identifier not from the URL,
but from a database.

The Chesnais Declaration disagrees, and asserts that, "The
specification, in the prior paragraph, teaches that the request (URL) will
identify the index function/string. Id. At col 15, ll. 63-65." (Chesnais
Declaration para. 23, citation in original). The quotation in the specification
reads as follows: "Thus, the input URL will identify particular types of
formatting and particular types of data. The formatting information for the
URL will result in particular function strings being read from the string list
store 1103." ('737 Patent 15:63-65). This passage is describing a different
implementation in which the format identifier is included in the URL. The
paragraph that contains this passage ('737 Patent 15:63-16:7) describes the
functions of the system all the way to the output of the appropriate HTML.
The next paragraph (beginning 16:8 and discussed above) describes an
alternative to getting the format identifier from the URL, which is to get the
format identifier from a user database.

11. The Dow Reply also argues that "The phrase *request for specified content data*
should be construed such that it does not read on a request to retrieve and execute a

7

specified file". (<u>Dow Reply</u> p. 13). The Dow Reply seeks to justify this additional limitation thusly: "That is, the specification makes clear that the invention is (<u>i.e.</u>, generating HTML pages 'on-the-fly' using an 'on-line processing' system) and what it is not (e.g. Retrieving and executing a file in response to a request that identifies that file)." (<u>Dow Reply</u> p. 13, underline in original). This passage does not indicate that one cannot or should not use any particular technologies in the invention.

12. Given that the specification discloses an embodiment that rules out the limitations that the Dow Reply and the Chesnais Declaration seek to attach to this term, the proper construction is simply to let the words of the term stand on their own. A "request" is just that. "Specified content data" are simply content data that have been specified.

13. **"Receiving":** "Receiving" simply means "receiving". The Chesnais Declaration and the Dow Reply seek to construe this simple term as "acquiring something transmitted". The Dow Reply and the Chesnais Declaration offer no support for this argument either in the plain and ordinary meaning or in the specification. Instead, they argue that a more complex construction is needed to differentiate the term "receiving" from "reading from a database", since these are both terms in the same claim. "Thus, accepting Ablaise's proposed construction of 'receiving format identifiers' would make redundant 'reading user preference information from said user database'." (<u>Dow Reply</u> p. 15).

14. Dow Jones' construction is a solution in desperate search for a problem. "Reading user preference information from said user database" is the process by which information is read from its **source**, i.e. a database. "Receiving format identifiers" is the process by which information is received at its **destination**. There is nothing wrong with having a patent claim elements on both the source and destination for

8

information.  In fact, in one disclosed embodiment, the format identifiers are received from a database, as discussed above (see paragraph 10.2).

15. There is no justification for Dow Jones' proposed "acquiring something transmitted" construction.  "Receiving" should simply be construed as "receiving".

16. **"Format identifiers":** A "format identifier" should be construed as: "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data."  This construction follows logically from the specification.  The language of the claim makes clear that the format identifiers are used to determine the type of formatting required: "...(c) receiving format identifiers identifying the type of formatting required." ('737 Patent Claim 1). In both the "template" embodiment and the "function string" embodiment, the formatting identifiers would correspond to different possible types of formatting.

17. The Dow Reply and the Chesnais Declaration insist that the "format identifiers" must be included in the URL.  "As discussed in paragraph 22, the specification and the applicants' arguments during the prosecution teach that formatting identifiers must be included in the request." (Chesnais Declaration para. 28).  For the same reasons discussed in the section above relating to the term "a request for specified content data", Dow Jones' arguments are incorrect.

18. **"Type of formatting":** In the context of web pages, to one skilled in the art at the time, "type of formatting" would simply have meant "a layout or presentation of text and/or graphics on a page".  That's what a "type" of "formatting" of a web page means.

19. The Dow Reply and Chesnais Declaration assert that "type of formatting required" should be construed as "indexed string of formatting functions".  This makes no sense.  Imagine that someone asks, "Should we paint this wall red or blue?"  The

natural answer would be to pick a color, but apparently Dow would reply, "Paintbrush." A paintbrush is a tool that can be used to apply a color, but it is not the color itself. "Type of formatting required" is not some kind of complex technical system – it is simply the particular kind of formatting that is required in a particular situation. For a web site, "type of formatting required" is what page layout must be provided to the user. "Indexed string of formatting functions" is the **mechanism** (like the "paintbrush" in the analogy) by which such output is created in **one** of the disclosed embodiments, but it is not the page layout (or, in the analogy, the required color ) itself.

20. In **one embodiment**, an indexed string of formatting functions is used to **create** the type of formatting required. Even in that embodiment, the indexed string of formatting functions is not itself the type of formatting. It is simply the mechanism that creates the type of formatting. However, as I described above in paragraph 4.1, the patent discloses another embodiment, which uses templates to create different types of formatting. Dow Jones' construction is clearly incorrect.

21. **"Selecting":** Ablaise is correct that "selecting" should simply be construed as "selecting". Dow Jones wishes to construe the term as "choosing from among several". This is clearly inconsistent with the patents-in-suit. It is clear from the patents that the claimed inventions are implemented as software running on computers. Computers cannot "choose" anything. They have no free will. Computers do what they are programmed to do. They may select one action or another, but they never "choose" to do so. A "choice" has certainly been made as to which formatting should be used, but the choice was made by the user. The computer system at issue in the claims is programmed to make a selection based on the user's choice, not its own. Therefore, "selecting" should not be construed as

10

"choosing from among several", but should instead simply be construed as
"selecting".

22. It is also clear that in one embodiment in the specification, the system "selects" a set
of stored functions by calling them: "Thus, when a particular call is made for
formatting signals, in the form of an executable string of functions, **the particular
call** identifies the index reference within the list of strings, resulting in the selected
**index being selected** from the list **and thereafter executed** in combination with
the referenced data." (<u>'737 Patent</u> 13:51-56, emphasis added).  There are other ways
that software can make a selection, but the one used in that embodiment is the
calling of functions.

23. **"A set of stored functions":**  "A set of stored functions" should be construed as
simply what it says: "a set of stored functions".  One skilled in the art at the time
would have known what a "set" was, would have known what "stored" meant, and
would have known what "functions" were (see discussion of "function" claim term
above).

24. The Chesnais Declaration argues that, "This phrase would have been understood by a
person of ordinary skill in the art at the time of the alleged invention to have a
meaning of 'a particular stored and indexed function string'.  The skilled person
would reach this interpretation because the specification consistently and repeatedly
teaches that in the **claimed embodiment** web pages are generated on-the-fly by
selecting a particular indexed function string from a table of indexed function strings
and consistently and repeatedly teaches that indexing is a key feature of the
invention." (<u>Chesnais Declaration</u> para. 31, emphasis added).

25. Once again, Dow Jones seeks to limit the claimed invention to one of the disclosed
embodiments (see paragraph 4.1 above).  The specification discloses a "template

11

embodiment" that has no need for any indexed function strings. There is no reason to overrule the plain and ordinary meaning of the term, especially to limit the term using **one** of the disclosed embodiments.

**Terms from the '530 Patent**

26. **"Requests from browsing devices that define a request for specified viewable data":** This term requires no construction. Dow Jones attempts once more to require that such requests not include "a request for a predetermined file or a request to retrieve and execute a computer program identified in the request." (Chesnais Declaration para. 32). Dow Jones' position is incorrect, for the same reasons that I listed above in the section on the term, "a request for specified content data".

27. **"Formatting type identification data":** The term "formatting type identification data" is easily construed. It is obviously data that are used to identify a type of formatting, which in the case of web pages is a page layout. If "identifying" a page layout is necessary, then there must be at least two possible page layouts. Therefore, the proper construction is, "data corresponding to a specified page format chosen from at least two page formats available to the requesting browsing device for specified viewable data."

28. The Chesnais Declaration specifically tries to exclude the "user identifier" from "formatting type identification data": "A person of ordinary skill in the art would not interpret 'formatting type identification data' to encompass a user identifier, as contended by Ablaise in its brief, Ablaise Br. At 39." (Chesnais Declaration para. 33). This attempt to add an additional limitation conflicts with a portion of the specification that specifically discloses using the user identifier to decide what kind of formatting to use: "In addition to use the user database to confirm user validity

12

and to record actions made by the user (possibly for billing purposes) the on-line
processor 301 may also make use of information read from the user database in
order to adjust the relationship between indexes (1106, 1109, 1110) and their
associated function strings and data (1107, 1108, 1111)." ('737 Patent 16:8-14).

29. **"Formatting types of data":** The term "formatting types of data" should be
construed as "sets of mark-up tags, such as HTML tags". Obviously, "formatting
types of data" are simply data that specify a type of formatting (see the construction
of "type of formatting" in paragraph 19.) As the patents-in-suit deal with web pages,
the data that determine the type of formatting for a page are sets of mark-up tags.
HTML tags are the most common example.

30. The Chesnais Declaration argues that the proper construction should be "types of file
structure data". (Chesnais Declaration para. 34). It is true that the detailed
description of the preferred embodiment uses the term "file structure data" in one
instance, although the specification usually uses "HTML" instead. Even in that one
instance, the specification is simply describing the use of HTML tags: "When
requested, the on-line processing will receive human viewable data from a database
406 in combination with file structures from a file structure source 407. Thereafter,
in response to instructions from the on-line processing system 405, the processing
environment 402 will process human viewable data in combination with file structure
data to produce HTML output files for the I/O device 304." ('737 Patent 8:37-44).
Since that embodiment's use of file structures adds the tags that format the HTML
output, the proper construction of the term is simply, "markup language, such as
HTML tags".

31. **"Maintaining":** The term "maintaining" simply does not require construction. The
Chesnais Declaration asserts that it should be construed as, "storing in a table":

"This term would have been interpreted by a person of ordinary skill in the art, at the time of the alleged invention, to mean 'storing in a table' because the specification makes clear that a critical feature of the invention is that the formatting data is stored in a table." (<u>Chesnais Declaration</u> para. 35).  This is simply not correct.  While the specification does disclose embodiments that store such data in a table, that does not mean that the use of a table is a "critical feature".  **The invention would also work if the data were maintained via other means, and no evidence has been offered by Dow Jones to the contrary.**  For example, the data could be maintained in a flat file, or in code itself.  Accordingly, there is no reason to construe this simple term.

14

Signature: _____     Date: 30 May 2007

On this 30th day of May, 2007, before me, the undersigned notary public, personally appeared Christian Hicks, proved to me through satisfactory evidence of identification, which were personal knowledge, to be the person who signed the preceding or attached documents in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his belief.

Azam A. Samanani
Notary Public
My Commission Expires Dec. 15, 2011

15